OSCAR JOHNSON, APPELLEE, V. AMERICAN SMELTING & RE-FINING COMPANY; MONTANA CONSOLIDATED GOLD MINING COMPANY, INTERVENER, APPELLANT.

FILED APRIL 1, 1916. No. 18591.

Bankruptcy: SALE BY TRUSTEE: RIGHT OF PROPERTY. Where an employee of a mining company was engaged by the general manager of such company to perform certain necessary services as a watchman, and also other labor, and performed the same, whereby said company became indebted to such employee, and said general manager in payment of said indebtedness delivered to such employee certain copper plates formerly in use by such company, but at that time abandoned and no longer in use and not attached as a fixture to any part of the machinery of such company, said employee may prop-erly be considered to be the owner of said plates, and, having sent the same to a smelting company to be smelted, will be entitled to

the proceeds thereof as against one who purchased the mining plant from the trustee in bankruptcy after the delivery of the plates to said employee; said plates not being in the inventory of said trustee at any time, or in his possession.

APPEAL from the district court for Douglas county : WIL-LIS G. SEARS, JUDGE. *Affirmed.*

*George W. Plummer* and *Weaver & Giller,* for appellant.

*Baldrige, Keller & Keller, contra.*

HAMER, J.

The plaintiff, Oscar Johnson, performed services as a watchman, and also other labor, for the Kimberly Mining Company, which was the owner of a mining plant in Montana. The mining plant became indebted to Johnson a little less than $2,000. It was financially embarrassed, and the plaintiff, Johnson, demanded to be paid for his labor, and with the purpose of paying him in view the general manager of the mining company delivered certain copper plates to said Johnson, who shipped them to the American Smelting & Refining Company at Omaha, for the purpose of having them smelted. While the plates had been a part of the Kimberly company's plant, nevertheless at the time they were delivered to the plaintiff they were loose and were not attached as a fixture to the mining company's equipment. The plaintiff appears to have worked for the company from a year and a half to two years and until a trustee in bankruptcy took charge of the affairs of the company. There was a sale by the trustee in bankruptcy of the plant of the Kimberly Mining Company to the Montana Consolidated Gold Mining Company. At the time of this sale the plates were in the possession of the plaintiff, Johnson, and had been in his possession for some time prior thereto. An action was brought by the plaintiff against the American Smelting & Refining Company to recover the proceeds of the plates which had been smelted by that company. The Montana Consolidated Gold Mining Company intervened. It was agreed that the value of the copper

plates was $1,758.44.  This amount of money was placed
in the hands of the district court for Douglas county to
await the disposition of the case as between the plaintiff
and the intervener; the smelting company disclaiming any
interest in the property.  The plaintiff had the verdict and
judgment against the intervener.

The intervener has appealed.  It complains of certain
instructions given by the court.  The first instruction
reads: "The question that is submitted to you is: Who was
the owner of the plates that were shipped from the mines
by Johnson, the plaintiff in this suit, to the smelting com-
pany at Omaha, before they were so shipped?  The money
in the hands of this court was derived from the smelting
of the plates by the smelting company, and the smelting
company disclaiming any interest in the matter in contro-
versy, has turned the money into court, to await your con-
clusion of ownership in the matter.  The smelting com-
pany is out of the case, and, Johnson and the intervening
Montana Consolidated Gold Mining Company each claim-
ing the ownership, the result is this trial.  The contention
of Johnson is that he performed certain services as watch-
man, and otherwise, for the Kimberly Mining Company,
owner of the mining plant, until the time that the Kim-
berly company was judicially declared a bankrupt in the
federal court of Montana; that during the time that he
was such watchman, and performing such service, Ryan
was the manager in control of the Kimberly property for
the Kimberly company, and that Ryan, acting within his
scope and powers of general manager, and with authority
so to do, paid the plaintiff, Johnson, for his said services
to the Kimberly company, by transferring to him title and
possession of the plates in question, and that he (Johnson)
became thereby the owner thereof, and as such owner made
the shipment to the smelting company, and that he is there-
fore entitled to the money in the court's possession, the
avails of the smelting of the plates.  All of these conten-
tions of Johnson are denied by the intervener, the Mon-
tana Consolidated Gold Mining Company.  In its turn, the

intervener, the Montana Consolidated Gold Mining Company, alleges that it became the owner of the plates from the smelting of which the money in court was derived, by reason of having bought all of the property of the Kimberly company at the trustee's sale, and that by reason thereof, the plates being part of the property at such time so bought, it is entitled to the money that has been paid into court. The plaintiff, Johnson, denies that the plates in question were a part of the plant of the Kimberly company at the time of the trustee's sale, but claims that prior to the time of that sale the title thereo, that is, to the plates, had become vested in the plaintiff Johnson."

It is then said, in substance, that it being established that the plates in controversy were at one time a part of the Kimberly company's plant, and that but for Ryan's sale the plates would have become the property of the intervener, therefore it is incumbent upon the plaintiff to establish by a preponderance of the evidence that prior to the time of the decree in bankruptcy the plates were sold to the plaintiff, Johnson, by. Ryan as the Kimberly company's manager, and were received by Johnson as a fair and reasonable compensation for his services. The jury were distinctly told that the burden of proof was upon the plaintiff to establish this fact by a preponderance of the evidence, and that if he failed to do so they should find for the intervener. We do not see any well-founded objection to this instruction.

By the third instruction given, the jury were told that the general manager had authority to keep watchmen and to pay them with the company's credit or money after a petition in bankruptcy had been filed against the company, if good, reasonable care should so require, and until the petition had been acted upon and a decree rendered adjudging the company to be a bankrupt. At the same time the court told the jury that there would be no right for the general manager to employ such watchman or to pay for his services with the fixtures of the plant such as were of general use and part of the plant's mechanism. He told the

jury that only such property as had been discarded from use could be used by agreement with the laborers in paying them their compensation. This instruction seems to be right.

In the fourth instruction the jury are told, among other things, that if they should find that during the interim between the filing of the petition and the court's decree the manager of the Kimberly company paid for the labor performed for that company with plates which were not the immediate fixtures of the plant, but which had been discarded and which had been delivered to the plaintiff, Johnson, then they should conclude that the title to the plates did not pass to the Montana Consolidated Gold Mining Company at the trustee's sale, but did pass to Johnson, who, being so paid, became the owner before the trustee's sale was held. This instruction seems to be without error.

The fifth instruction reads: "In considering whether or not Ryan, as manager of the Kimberly company, did in fact sell to Johnson the plates, as Johnson claims, you will consider all the evidence relating thereto, including the evidence bearing upon whether or not he performed the services, whether or not Johnson was paid in fact by Ryan, as he claims, by the sale to him of the plates, whether or not in good faith they were ever discarded as proper working plates for the plant, whether or not they were ever delivered to Johnson, and, from all the facts and circumstances shown in evidence, come to your best conclusion as to the matters submitted for your consideration." This instruction seems to be fair.

The first instruction given to the jury at the request of the appellee is, in substance, as follows: You are instructed that if you find from the evidence that in August, 1908, and prior to the bankruptcy of the Kimberly-Montana Gold Mining Company, said company was indebted to the plaintiff for services already rendered, and thereafter to be rendered, by him as watchman and custodian of its mining plant and properties at Jardine, Montana, and that H. M. Ryan was then the managing director of

that company and, as such, had charge of its properties and business at Jardine, Montana, and for the purpose of paying for such services turned over to the said plaintiff the said copper plates, the same not being a part of the then working plant, and from the proceeds of which the money now on deposit in this court was realized through the American Smelting & Refining Company, to whom said Johnson had shipped said plates to be smelted, then your verdict should be for the plaintiff in this case, and it is unnecessary as a matter of law, that the said Ryan should have made any formal bill of sale to said Johnson if he turned the plates over to the plaintiff.

The election of Mr. Ryan as managing director of the Kimberly company is shown by the record to have been unanimous.

J. C. McMynn testified that he was the consulting engineer of the Kimberly company; that Oscar Johnson, the plaintiff, was the watchman of the property. On cross-examination he testified that Johnson was his general utility man. The evidence shows that Mr. Ryan had been accustomed to buying and selling property for the Kimberly company. "Q. Did Mr. Walsh, as trustee, take charge of these plates at any time? A. No, sir. * * * Q. The first time? State whether or not he recognized your claim as the owner of those plates? A. That is the understanding." There appears to be no denial of this.

M. J. Walsh, the trustee in bankruptcy, testified that he sold the property of the Kimberly company to the Montana Consolidated Gold Mining Company; that the copper plates in controversy in this case were not included in the inventory because, before he was appointed receiver, he was told that the plates did not belong to the company, and, after he was appointed, he was again told that the plates did not belong to the company, but belonged to Mr. Johnson.

Walsh's testimony shows that he was the trustee in bankruptcy of the Kimberly company from the 9th day of August, 1909, to the 26th day of May, 1910. There was

introduced in evidence a letter written by Oscar Johnson, known as the "Dryfus letter." It is dated March 31, 1913, and states: "I have been employed here to look after the property since 1907. Some time during 1908 Mr. Ryan, as managing director, gave me authority to sell the copper plates, as they were no good for any further use. They were torn up and scrapped when the mill first shut down. I was put here with an understanding that I was to get $90 a month. All I ever received was $200."

In conclusion, it would seem that the evidence shows that the plaintiff was properly employed by the general manager of the company, and that the company became in debt to him, and that the plates were turned over in payment of the debt, and that the plaintiff is entitled to the avails of the plates which were shipped to the smelting company at Omaha. The plates do not appear in the inventory of the trustee in bankruptcy and were never in his possession, and there is a failure to show that the intervener, the Montana Consolidated Gold Mining Company, bought them from him.

The judgment of the district court is

AFFIRMED.

ROSE, J., dissents.

SEDGWICK, J., concurring.

The appellant states as the proposition of law relied upon for reversal that "all of the property owned by the bankrupt at the date of the filing of the petition passed to the trustee, and from the trustee to the purchaser at the sale." This is the only question discussed with any attempt at compliance with supreme court rule 12. The petition in bankruptcy was filed December 18, 1907. The adjudication of bankruptcy was June 18, 1909. If the date of the appointment of a receiver is stated in the briefs, it is lost in the mass of evidence stated, but not utilized by the parties under rule 12. April 20, 1910, the property of the bankrupt was ordered sold, and was ac-

cordingly sold by the trustee December 15, 1910. There is no doubt, under the many cases cited by appellant, that as between creditors, and as to the right to prefer creditors, and perhaps for other purposes, the filing of the petition in bankruptcy fixes "the date of cleavage." Even for a time before the petition is filed creditors are prevented from obtaining preferences. For 18 months after the petition in bankruptcy was filed the property remained in the hands and under the control of the alleged bankrupt before any further proceedings were had. It was cared for and protected by the alleged bankrupt; this plaintiff having been employed for that purpose. Neither the creditors nor the court objected to using the money or property for that purpose. There was no appointment of a receiver until after the services were rendered and paid for. It would seem, under the decisions of the federal courts, cited by the parties, that to employ and pay the plaintiff was the proper thing to do. However that may be, which is a question for the federal courts, the creditors and the court, by its receiver, are not now complaining. The appellant claims to have bought this property at the receiver's sale, but the property was not described or included in the inventories, and, with the consent of all parties interested, had been shipped to Omaha before appellant purchased at the sale, which seems to be a complete answer to this claim. The appellant could not buy this property at the receiver's sale under the circumstances. If one of the creditors had taken this property and sold it in Omaha, another creditor, or the receiver, might require an accounting for the property. If this plaintiff has made himself liable to the creditors or to the receiver for the proceeds of this property, that fact would not transfer the title and ownership of the property to a subsequent purchaser of the remaining property of the bankrupt. The appellant suggests in the brief that the plaintiff conspired with the manager of the bankrupt company to withdraw these plates from a machine of which they were really a part, and, for that reason, when appellant bought that machine it also

bought these plates, which were then in Omaha, and so is entitled to the proceeds of the sale of the plates. But there is no citation or discussion in the brief, in connection with this suggestion, of any evidence which would support such a charge, even if that would give appellant any right to the proceeds of the sale of the plates. In any view of the case, so far as appears from the discussion in the brief, the judgment of the court is the only one that could be supported, and I concur in affirming it.